UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Fort Lauderdale Division

Case Number: 10-CV-61902-KMM/Torres

D.L., by and through his next
friend, Lisa Lampkin, *et al*.,

    Plaintiffs,

vs.

YOUTH SERVICES INTERNATIONAL,
INC., *et al*,

    Defendants.
_____/

**PRIVATE DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

    **A.    All Plaintiffs Have Been Released From Thompson Academy.**

    1. Plaintiff D.L. was released from Thompson Academy on December 16, 2010, and is not seeking money damages in this lawsuit. Ex. 1, pp. 11, 341. Plaintiff T.P. was released on November 16, 2010, and is not seeking money damages in this lawsuit. Ex. 2, pp. 89-90, 342-44. Plaintiff D.B.1 was released on December 20, 2010, and is not seeking money damages in this lawsuit. Ex. 3, pp. 47, 324. Plaintiff C.L. was released on March 7, 2011 and is not seeking money damages in this lawsuit. Ex. 4, pp. 9-10, 248. Plaintiff D.B.2 was released on October 1, 2010. Ex. 5, p. 15.

    **B.    No Excessive Force Was Used Against D.L. and He Suffered No
           Physical Injury as a Result of the Alleged Harm.**

    2. Protective Action Response ("PAR") techniques are employed at Thompson Academy when a youth poses an imminent threat to himself, other youth, or staff. All prospective employees receive 40 hours of training on PAR techniques through a program curriculum devised by the Florida DJJ, and must pass a PAR training test before being hired. In addition, employees receive PAR "refresher" training annually. PAR involves both verbal and physical components, and verbal commands are to be exhausted before physical restraint is employed. At Thompson Academy, staff are trained to employ seven levels of intervention: friendly non-

verbal, concerned verbal, helpful verbal, concerned verbal, youth support, staff intervention, and PAR. The PAR techniques employed at Thompson Academy include the straight arm escort or arm control technique, the basket hold, and the team takedown. Different PAR techniques are utilized depending on the given situation and the level of youth aggression. For example, a straight arm escort may be employed by staff at Thompson Academy in circumstances where a youth is being combative, agitated, argumentative, or inciting a disturbance, in order to remove the youth from the area. Thompson Academy policy requires an incident report to be written after PAR is used, and if abuse is determined to have occurred, an abuse call is placed to the Florida DJJ abuse hotline. Ex. 10, pp. 255-56; Ex. 11, pp. 46, 56, 62-64, 68, 72-80, 89-94.

3. D.L. was advised soon after his admission to Thompson Academy that physical restraint could be employed by staff members to deescalate altercations or incidents after receiving seven levels of intervention. D.L. was further advised soon after his admission that if he was ever involved in an altercation or incident and ignored verbal warnings, physical restraint or PAR could be authorized. From the day he was admitted to Thompson Academy, D.L. understood the program's grievance process and how to make an abuse call. Ex. 1, pp. 62-69, 71-77, 262.

4. D.L. relates two separate instances of abuse from Thompson Academy staff members. On one instance in April or May of 2010, D.L. claims a staff person bent D.L.'s arm behind his back after he talked back to staff. D.L. filed no grievance about this incident; nor did he make an abuse call to the DJJ abuse hotline. D.L. claims to have suffered physical injuries from this incident, but never sought medical care from the staff at Thompson Academy for the injuries. D.L. received medical care in July or August after hurting his shoulder playing basketball and claims that this medical care was really related to the incident in April or May, but states that he lied to the medical personnel about the true nature of his injury. Ex. 1, pp. 200-08.

5. The second incident of alleged staff abuse involving D.L. is a. matter involving staff member Augustine on the morning of September 27, 2010. On that morning, Augustine was running a focus group with fellow staff member Pressley. The youth on the unit were supposed to stand and say something positive to youth who were being released. Of note, D.L.'s release date had been postponed twice by his judge at the time of this incident and he admitted that he was upset at the time and wanted to go home. Rather than make a positive remark, D.L. made a negative remark to the youth and, as a result, Augustine asked D.L. to stand up. D.L. refused, despite being asked repeatedly by Augustine. Augustine asked for youth support and staff

support from Pressley, but D.L. refused. At that time, D.L. was in a jumpsuit[1] due to an incident several weeks earlier where he punched another youth on the unit. D.L. claims that Augustine grabbed him by his jumpsuit and slammed him into a wall three times before Pressley intervened. Ex. 1, pp. 245-64, 444-46.

6. Augustine states that D.L. was being combative and disruptive and cursing at the other youth, so he exhausted the seven levels of intervention before employing a straight arm escort to remove D.L. from the unit and to deescalate the situation. After applying a straight arm escort, D.L. grabbed Augustine's shirt collar and the two scuffled before Pressley intervened. Augustine denies slamming D.L. against the wall. In addition, staff member L. Hunter, who witnessed the incident, denies that Augustine slammed D.L. into the wall. Ex. 12, pp. 128-48; Ex. 13, pp. 81-84.

7. D.L. filed no grievance immediately after the altercation with Augustine. Instead, a grievance was filed several days later on D.L.'s behalf by his attorneys. D.L. also refused to make an abuse call after this incident and signed a document affirming that he was given the chance to call the abuse hotline and refused. Instead, an abuse call was made on his behalf. D.L. was assessed by medical staff after the altercation and had no injury other than a scrape on his neck. Ex. 1, pp. 273-74, 282, 286, 297-98.

8. After the incident between D.L. and Augustine, Augustine was placed on administrative leave, removed from D.L.'s unit, and D.L. never saw him again. Ex. 1, p. 299; Ex. 12, pp. 162; Ex. 10, pp. 275.

9. The incident between D.L. and Augustine was investigated by the Florida DJJ and found that the allegations of abuse were unsubstantiated. The incident between D.L. and Augustine was also investigated by the Pembroke Pines Police Department, and no criminal charges were brought against Augustine. Ex. 1, 294-95; Ex. 14; Ex. 15.

### C. Plaintiffs Were Not Denied Access to Counsel, Experienced No Retaliation For Exercising Their Right to Counsel, and Suffered No Legal Injury from the Alleged Denial of Access to Counsel.

10. Plaintiff D.L. was told of his right to see or call his attorney upon his admission to Thompson Academy. D.L. met with his attorneys in this case 15 times, and was never denied

---

[1] As explained further in Section D below, youths are placed in jumpsuits whenever they are placed under Intensive Support and Supervision ("ISS") status.

access to his attorneys at Thompson Academy. D.L. also placed a call to his private attorney in his criminal case regarding the denial of his release by his criminal judge. After a grievance was filed by his attorneys regarding an alleged denial of access, D.L. met with his attorneys every week, and spoke with them multiple times on the phone without restriction. D.L. was never denied any request to meet with his attorney. D.L. was moved to the "Honor Room" [2] for good behavior six months before his release in December, and he remained there even after his altercation with Mr. Augustine, after he met with his attorneys, and after he had filed this lawsuit. D.L. was never punished for speaking with his attorneys. Ex. 1, pp. 132-34, 216, 300, 305-11, 327-28, 331, 438; Ex. 6.

11. Plaintiff T.P. was told about his rights to see and speak with an attorney upon his admission to Thompson Academy. T.P. met with his attorneys in this case at least 10 times while at Thompson Academy. T.P. also met with his public defenders at Thompson Academy. T.P. wrote a grievance alleging denied access to counsel despite having already met with counsel. After filing the grievance, T.P. continued to meet with his attorneys. In addition, T.P. stayed in the "Honor Room" for two months at the end of his stay, despite meeting with his attorneys. T.P. was never punished or disciplined for meeting with his attorneys and he was still able to file this lawsuit despite the alleged denial of access to counsel. Ex. 2, pp. 132, 153-54, 272-81, 311; Ex. 7.

12. Plaintiff D.B.1 was told about his rights to see and speak with an attorney upon his admission to Thompson Academy. D.B.1 met with his attorneys in this case between 10 and 15 times while at Thompson Academy. D.B.1 also met with and spoke over the telephone to his Public Defenders at Thompson Academy. D.B.1 could not relate a single instance where any other youth was denied access to attorneys. D.B.1 was never disciplined or punished for meeting with his attorneys. D.B.1 was never retaliated against for meeting with his attorneys, and he never had time added onto his stay at Thompson Academy for meeting with his attorneys. D.B.1 signed a statement in September, 2010 stating that he did not want to meet with David Utter or his staff, but was not coerced to sign it and was told that he did not have to sign it if he did not want to. After D.B.1's mother found out that he signed the document, she told him to have it expunged. D.B.1 thereafter had the document expunged and continued to meet with his attorneys without incident or retaliation. Ex. 3, pp. 99, 192-95, 206-11, 356-62; Ex. 7.

---

[2] The Honor Room is considered a reward for youth, and has nicer beds, a radio, and television.

13. Plaintiff C.L. was told about his rights to see and speak with an attorney upon his admission to Thompson Academy. At the time of his scheduled deposition, and while still a resident at Thompson Academy, C.L. met with his attorneys in this case between 10 and 15 times, including two attorney visits for six hours to prepare for his deposition. C.L. wrote a grievance alleging denied access to counsel despite having already met with counsel. After filing the grievance, C.L. continued to meet with his attorneys once a week and was able to file this lawsuit despite the alleged denial of access to counsel. Ex. 4, pp. 16-17, 127, 226-28; Ex. 9.

### D.   Plaintiffs D.L., T.P., and D.B.1 Did Not Have Their Stays Arbitrarily Extended or Their Due Process Rights Violated.

14. Before a youth can be discharged from Thompson Academy, he must complete four levels and comply with treatment goals. A Treatment Team meeting is held every 30 days to determine if the youth has completed the program goals, which includes a review of school credits and performance in the program. Emergency Treatment Team meetings can be held for rule violations such as fighting, cursing at staff, not completing schoolwork, disrespecting teachers, or breaking program rules. Youth are made a part of the Emergency Treatment Team meetings. At the conclusion of an Emergency Treatment Team, a child can be placed on Intensive Support and Supervision ("ISS") in which consequences are imposed, such as writing an apology letter. Before a youth is placed on ISS, the youth is given the form assigning him to ISS status to sign. A youth placed on ISS is put in a jumpsuit designating his ISS status, and he cannot make progress in the program while on ISS status. Youth are generally on ISS for less than 21 days. Ex. 16, pp. 77-80, 85-87, 108-17.

15. Plaintiff D.L. understood upon his admission to Thompson Academy that he needed to make progress in order to complete the program, and that he could lose privileges if he did not follow instructions. D.L. also understood that he could be placed on ISS and put in a jumpsuit for things like not abiding by the rules, disrespecting teachers, not performing in school, and for breaking the code of conduct in the program's handbook. As a result of a fight with another youth on September 8, 2010, D.L. was placed on ISS status. However, D.L. denies that he had extra time added to his stay at Thompson Academy. D.L. also denies that he was punished or that his stay was extended in any way as a result of his altercation with Augustine. In fact, D.L. states that his stay was extended by his judge on three occasions due to unintentional mistakes made by his case manager and/or probation officer. Ex. 1, pp. 108-10, 237-51, 290-91, 392-99.

16. Plaintiff T.P. understood upon his admission to Thompson Academy that he needed to complete four levels to fulfill the treatment program, and that his stay in the program would last, at a minimum, six months. T.P. stayed six months and one week. T.P. was told at orientation his first day that his stay could be extended for such things as fighting and not listening. T.P. denied that youth are disciplined arbitrarily at Thompson Academy. Ex. 2, pp. 102-06, 147, 300.

17. Plaintiff D.B.1 understood upon his admission to Thompson Academy that he would be in the program for six to nine months. D.B.1 further understood that, to complete the Thompson Academy program, he needed to progress through the four treatment levels, which involved completing his level packet, keeping his grades up, making sure that treatment team meetings were successful, and not getting into any fights or disturbances. In August of 2010, D.B.1 was involved in a premeditated fight with another youth. As a result of the fight, D.B.1 was written up and an Emergency Treatment Team meeting was held. At this meeting, D.B.1 was given a chance to give his side of the story and was told what the other youth alleged. As a result of this fight, D.B.1 had 30 days added to his stay. D.B.1 could not relate a single instance of youth being charged or written up without being given prior written notice. D.B.1 filed a grievance stating that the 30-day extension to his stay was illegal and unconstitutional. However, D.B.1 acknowledged that he should not have been fighting and that he violated the program rules by fighting. Ex. 3, pp. 83, 87-89, 91-92, 184-89, 220-31, 288-91.

### E. Plaintiff C.L. Was Not Denied Necessary Medical Care at Thompson Academy and Suffered No Injury as a Result of the Alleged Denial of Medical Care.

18. Plaintiff C.L. underwent a medical evaluation upon being admitted to Thompson Academy. In this medical evaluation, a nurse questioned C.L. about his medical history. During the evaluation, C.L. voiced no complaints. C.L. neglected to tell the nurse about multiple surgeries for the injury, orders from his treating doctor, physical therapy that he started months earlier and failed to continue, the need to continue physical therapy, or the fact that he had been ordered to see a neurologist six months earlier. Ex. 4, pp. 105-13.

19. During his stay at Thompson Academy, C.L. received multiple visits of physical therapy for his shoulder and was seen by a neurologist. Thompson Academy scheduled these appointments and provided transportation to the off-site medical facilities. C.L. wrote a grievance on November 5, 2010, complaining that he was not being provided physical therapy,

but testified that he was aware at the time that efforts were already being made by Thompson Academy to schedule physical therapy for him. C.L. began physical therapy on November 10, 2010. C.L. made no sick call requests voicing any complaints related to his injured arm until November 21, 2010, after he had already attended his first session of physical therapy. On January 19, 2011, C.L. was seen by a neurologist who found C.L. to have minimal residual weakness in his injured arm and graded his arm strength 4++ out of 5. Ex. 4, pp. 179-80, 193-97, 207-08, 214-15. Ex. 17, pp. 68-69.

20. DJJ investigated C.L.'s complaints and found no evidence that Thompson Academy was aware of C.L.'s need for physical therapy or that program intentionally disregarded C.L.'s need for physical therapy. C.L. agrees that there is no evidence that Thompson Academy intentionally disregarded his medical needs. Ex. 4, pp. 216-22.

### F. Plaintiffs D.L., T.P., D.B.1, and C.L. Were Provided With Adequate and Nutritious Meals and Did Not Lose Weight.

21. Youth at Thompson Academy have their height, weight, and body mass index ("BMI") tested monthly, and if they lose more than five pounds in a month, they are referred to the program's designated health authority. Youth at Thompson Academy receive a daily caloric intake that exceeds the minimum daily requirements. Ex. 17, pp. 90, 93, 108-09; Ex. pp. 155.

22. Plaintiffs D.L., T.P., D.B.1, and C.L. all received breakfast, lunch, and dinner every day at Thompson Academy, including a snack. For breakfast, Plaintiffs received items like cereal, oatmeal, grits, breakfast sandwiches, fruit cups, apples, waffles, honey buns, juice and milk. For lunch, they were served sandwiches, hamburgers, baked ziti, chicken nuggets, hot dogs, chicken sandwiches, spaghetti, ziti alfredo, turkey, gravy, roast chicken, pizza, all with sides of vegetables, and Kool-Aid or water to drink. For dinner, Plaintiffs received salad every day and meals like chicken and rice, pizza, shepherd's pie, pork chops, and vegetables, with juice or water, and a peanut butter and jelly sandwich as a snack with dinner every day. Ex. 1, pp. 137-41, 163-69; Ex. 2, pp. 155-56, 160-61, 233-35; Ex. 3, pp. 143-48; Ex. 4, 156-59.

23. Florida DJJ and Thompson Academy records show that D.L. weighed 163 to 165 pounds at admission and 181 pounds at the time of discharge. D.L. also worked in the cafeteria during his time at Thompson Academy, and was given extra food. During the time that D.L. worked in the cafeteria, D.L. never saw bugs or other foreign objects in the food. Ex. 1, pp. 146-61.

24. T.P. weighed 132.5 pounds when admitted to Thompson Academy and weighed 132 at discharge. T.P. found foreign objects in his food on two occasions but was given a new tray of food when he showed it to staff. T.P. also admits to gambling with other youth for food. Ex. 2, pp. 224-26, 234-35.

25. D.B.1 weighed 145 pounds upon admission to Thompson Academy and 143 pounds at the time of his deposition. D.B.1 was weighed by the nurse every month at Thompson Academy. He also admitted to gambling with food with other youth. D.B.1 filed a grievance in October complaining of weight loss, and was seen by a Thompson Academy nurse five days later and found to have gained one-half a pound. The only foreign objects D.B.1 found in his food were hair and gnats or occasional fruit flies in the salad, and staff always gave D.B.1 a new tray of food if he found hair in it. Ex. 3, pp. 69, 90-91, 143-48, 169, 173, 275-76.

26. C.L. weighed 126 pounds when admitted to Thompson Academy and did not feel that he lost any weight in the facility. C.L. is aware of three instances where youth found foreign objects in their food. C.L. was unaware of how the foreign objects got into the food, and had no evidence that Thompson Academy employees knew of the presence of the foreign objects in the food before it was served. The only foreign objects C.L. found in his food were ants, a fly, and hair. Ex. 4, pp. 160-64, 168-73.

### G.   Plaintiffs Were Provided Adequate Treatment and Rehabilitation at Thompson Academy.

27. Plaintiff D.L. received counseling at Thompson Academy Monday through Friday, in addition to group therapy and daily focus groups in the mornings. D.L. also received regular medication for ADHD and severe mood disorder while at Thompson Academy. D.L. obtained his G.E.D. while at Thompson Academy. D.L. had daily recreation, playing basketball or two-hand touch football, and would watch movies or play dominoes when it was too hot or raining outside. Ex. 1, pp. 88-89, 93-95, 99, 106-08, 172-75.

28. Plaintiff T.P. received group therapy Monday through Friday, and found it helpful. T.P. also received one hour of recreational activities a day. Plaintiff D.B.1 received drug treatment at Thompson Academy and went to daily focus groups. D.B.1 also had group therapy Monday through Friday for one hour, as well as one-on-one therapy every other week with his therapist, and family sessions with his mother every three weeks. D.B.1 found the therapy at Thompson Academy helpful for him and the other youth, and he still uses some of the things he learned in

his everyday life. D.B.1 also took the GED pre-test at Thompson Academy and passed. Plaintiff C.L. received counseling at Thompson Academy Monday through Friday with a therapist. C.L. also received one hour of daily recreation. Ex. 2, pp. 162-63, 297; Ex. 3, pp. 66, 129-136, 269. Ex. 4, pp. 129, 131, 137-39.

### H. D.B.2. Was Not Sexually Abused By R. Pressley.

29. Plaintiff D.B.2 is a homosexual and had sexual encounters with other males before his admission to Thompson Academy. At Thompson Academy, D.B.2 believed that everyone knew he was gay, and he claims to have given oral sex to at least 10 different youth at Thompson Academy. The youth denied these sexual encounters and wanted to fight D.B.2 over his accusations. Some of the youth filed grievances claiming that D.B.2 made false allegations about them. These allegations were investigated by the DJJ and D.B.2's allegations were determined to be unsubstantiated. Ex. 5, pp. 44-57, 92, 168-80, 184, 204, 251-61; Ex. 18.

30. D.B.2 claims to have had sexual contact with staff member R. Pressley on two occasions. D.B.2 claims that before the first incident occurred, Pressley gave him a note saying he wanted to "F" him but D.B.2 did not tell anyone. On the first occasion, D.B.2 claims to have given Pressley oral sex in a laundry room on his unit. D.B.2 could not provide any specific details as to the date or time of this incident. According to D.B.2, he performed oral sex on Pressley in the laundry room while the door was open, with multiple people nearby, for between five to 20 minutes, until Pressley ejaculated. D.B.2 claims that staff member T. Hutchinson walked nearby during the act. Nevertheless, D.B.2 did not try to run away, fight Pressley off, or call out to the staff member to help him. Ex. 5, pp. 185-87, 199-200, 204-12.

31. After this alleged incident occurred D.B.2 reported it to T. Hutchinson, and a meeting with Thompson Academy administration was promptly held. D.B.2 was asked questions about the incident and the administrators appeared to take his allegations seriously. D.B.2 did not immediately file a grievance or make an abuse call after this incident because, in his words, he did not want other staff members to find out that Pressley was gay and because D.B.2 did not feel abused by Pressley. In his own words, D.B.2 explained "[b]ecause I'm gay and I just – and that was something I did – I like to do," and that "[g]iving oral sex is something I like to do." Ex. 5, pp. 212-19.

32. The second sexual contact between D.B.2 and Pressley allegedly occurred in the bathroom of an offsite dental office that D.B.2 was transported to in August. D.B.2 claims that

Pressley took him to the downstairs bathroom, located in a busy area where people were walking into the building from the outside. D.B.2 claims that Pressley entered the bathroom, locked the door, removed his handcuffs, and performed oral sex on D.B.2 before D.B.2 reciprocated and performed oral sex on Pressley. The encounter lasted at least 10 minutes. D.B.2 made no effort to resist or call for help. D.B.2 further states that this was a consensual act, and that he did not mind performing oral sex on Pressley. D.B.2 described Presley's penis as being circumcised. Ex. 5, pp. 273-97, 337-38, 434-36.

33. D.B.2 knew how to file a grievance and how to make an abuse call on the abuse hotline phones located in his unit, and had filed 15 grievances before October of 2010, including one complaint that a youth had falsely accused him of giving him oral sex. However, D.B.2 did not file a grievance alleging either incident with Pressley until October 2, 2010 when grievances were filed by his attorneys alleging sexual assaults by Pressley in February or March and August of 2010. The same day he made these accusations, D.B.2 was removed from Thompson Academy. Ex. 5, pp. 67-72, 244-50, 353.

34. The Pembroke Pines Police Department investigated the alleged sexual assault. Pursuant to their investigation, D.B.2 gave a statement under oath claiming that he performed oral sex on Pressley in the dentist office bathroom for five minutes, and that his handcuffs were never removed. D.B.2 never stated to the officer that Pressley performed oral sex on him. D.B.2 also told the officer that this was part of a plan where he intended to sue Pressley. D.B.2 was offered the chance to take a polygraph test, but declined to do so. The officer obtained copies of the surveillance video from the dentist's office and Pressley's phone records. The investigation was closed as unfounded and no criminal charges were brought against Pressley. Ex. 5, pp. 303-318, 328, 347-48; Ex. 19.

35. Pressley denies any and all allegations of sexual contact with D.B.2. Pressley testified that his sexual orientation is heterosexual and that he has two children with his ex-fiancé. He has no criminal record. After the first alleged incident, an internal investigation was held at Thompson Academy involving D.B.2.'s sexual claims. Pressley denied any sexual contact to the investigating panel and was moved to a different unit as a result of the investigation. After the second allegation, Pressley was placed on administrative leave. Pressley was offered to take a lie detector test by the investigating officer and was told that he passed. Pressley also denies that he is circumcised. Ex. 19; 20, pp. 10, 22, 98-99, 101, 104-06, 232-33, 240-42, 274-75, 279-81, 294.

DATED:  April 21, 2011.

        By: */s/ Tod Aronovitz*
            Tod Aronovitz (FBN 186430)
        By: */s/ L. Elijah Stiers*
            L. Elijah Stiers (FBN 737070)
            **ARONOVITZ LAW**
            777 Brickell Avenue, Suite 850
            Miami, FL 33131
            305-372-2772 Telephone
            305-397-1886 Facsimile

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court using CM/ECF this 21st day of April, 2011. I further certify that the foregoing document is being served on all counsel identified on the attached Service List in a manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive electronically Notices of Electronic Filing.

By: */s/ Tod Aronovitz*

**SERVICE LIST**
**D.L., et al. vs. Youth Services International, Inc., et al.**
**0:10-cv-61902-KMM/Torres**

**Attorneys for Plaintiffs:**

Matthew Farmer
**FARMER & FITZGERALD, P.A**.
708 East Jackson Street
Tampa, FL 33602
Telephone: 813-228-0095
Facsimile: 813-224-0269
mattfarmer1@aol.com

David Utter
(Admitted *Pro Hac Vice*)
Vanessa Carroll
 (Admitted *Pro Hac Vice*)
Miriam Haskell
Kristi Graunke
**SOUTHERN POVERTY LAW CENTER**
4770 Biscayne Blvd., Suite 760
Miami, Florida 33137
Phone: 786-347-2056
Fax: 786-247-2949
vanessa.carroll@splcenter.org
david.utter@splcenter.org
miriam.haskell@splcenter.org
Kristi.Graunke@splcenter.org

Jody E. Owens, II
(Admitted *Pro Hac Vice*)
**SOUTHERN POVERTY LAW CENTER**
921 North President Street
Jackson, MS 39202
Phone: 601-948-8882
Email: jody.owens@splcenter.org

Lewis J. Conwell
Angela J. Crawford
E. Colin Thompson
Stephanie Adams
Leeanne S. Neri
Michael Sevi
**DLA PIPER LLP (US)**
100 North Tampa Street, Suite 2200
Tampa, FL 33602
Telephone (813) 229-2111
Facsimile (813) 229-1447
lewis.conwell@dlapiper.com
angela.crawford@dlapiper.com
colin.thompson@dlapiper.com
Stephanie.adams@dlapiper.com
Leeanne.neri@dlapiper.com
michael.sevi@dlapiper.com

Stephen F. Hanlon
Brian W. Toth
Stacey Wang (Admitted *Pro Hac Vice*)
**HOLLAND & KNIGHT**
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, DC 20006
202-955-3000 Telephone
202-955-5564 Facsimile
stephen.hanlon@hklaw.com
brian.toth@hklaw.com
stacey.wang@hklaw.com

**Attorneys for Defendants,
Youth Services International, Inc.,
Craig Ferguson, Mr. Augustin,
and Mr. Pressley:**

Tod Aronovitz
L. Elijah Stiers
**ARONOVITZ LAW**
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-372-2772 Telephone
305-397-1886 Facsimile
ta@aronovitzlaw.com
es@aronovitzlaw.com


**Attorneys for Defendant,
Frank Peterman, Jr.:**

Christopher J. Whitelock
**WHITELOCK & ASSOCIATES, P.A.**
300 Southeast Thirteenth Street
Ft. Lauderdale, FL 33316
Telephone: (954) 463-2001Facsimile: (954) 463-0410
cjw@whitelocklegal.com